1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>RAINIER PETROLEUM CORP.,<br><br>　　　　　　　Defendant. | CASE NO. C14-0829JLR<br><br>ORDER ON MOTION TO ENFORCE AND MODIFY CONSENT DECREE |

16

## I.   INTRODUCTION

17

Before the court is Plaintiff Puget Soundkeeper Alliance's ("Soundkeeper")

18

motion to enforce and modify the consent decree and for leave to conduct discovery.

19

(Mot. (Dkt. # 101).)  The court has considered the motion, the submissions in support of

20

and in opposition to the motion, the relevant portions of the record, and the applicable

21

law.  The court also held an evidentiary hearing and heard the arguments of counsel on

22

//

1 | December 13, 2017. (12/13/17 Min. Entry (Dkt. # 123).) Being fully advised, the court

2 | GRANTS in part and DENIES in part the motion for the reasons set forth below.

3 | ## II. BACKGROUND

4 | On June 6, 2014, Soundkeeper filed this lawsuit against Defendant Rainier

5 | Petroleum Corporation ("Rainier") under the Clean Water Act ("CWA"), 33 U.S.C.

6 | § 1251 *et seq.* (Compl. (Dkt. # 1).) Soundkeeper alleged that Rainier violated the CWA

7 | and various provisions of Rainier's National Pollution Discharge Elimination System

8 | ("NPDES") general permits for stormwater discharges. (*Id.* ¶ 1.) Soundkeeper alleged

9 | that Rainier's violations were due to industrial activities at Rainier's Pier 15 facility in

10 | Seattle, Washington ("the Facility"), which caused polluted stormwater discharges to

11 | enter Elliot Bay, a navigable water. (*Id.* ¶¶ 1, 19.) Soundkeeper asserted that Rainier's

12 | stormwater discharge exceeded its permits "each day during which there [wa]s 0.1 inch

13 | or greater precipitation." (*Id.* ¶ 20.)

14 | Rainier leases the Facility and Pier 15 from Exxon Mobil ("Exxon") and operates

15 | on the western side of the pier. (Kovacich Decl. (Dkt. # 107) ¶¶ 3-4.) Shell operates on

16 | the eastern side of the pier. (*Id.* ¶ 4.) The Facility covers between one and two acres and

17 | includes a truck loading rack, a parking area, a tank farm, the western half of the pier, and

18 | three buildings—a boiler building, a warehouse, and an administrative building. (*See* 2d

19 | Horner Decl. (Dkt. # 25) ¶¶ 11-12; 2d Tonry Decl. (Dkt. # 27) ¶ 6, Ex. 5 Stormwater

20 | Pollution Prevention Plan ("SWPPP") at 5.) Stormwater from all three buildings' roofs

21 | drains through gutters into Elliot Bay. (2d Horner Decl. ¶ 16; *see* SWPPP at 6, 8-9.)

22 | Rainier's tank farm contains six 11,750-gallon lubricating oil tanks and one

1  11,750-gallon oil/water separator tank, is surrounded by a concrete containment berm,

2  and has a pervious gravel floor. (*See* 2d Horner Decl. ¶¶ 11, 18; Lider Decl. (Dkt. # 28)

3  ¶ 3, Ex. C ("Lider Report") at 4-5; SWPPP at 5, 7.)

4       Rainier uses the western half of the pier to dispense and receive diesel fuel and

5  lubricants to and from ships, barges, and other marine vessels. (*See* 2d Horner Decl.

6  ¶ 12; SWPPP at 6.) Rainier asserts that it conducts fueling operations on the pier only in

7  areas surrounded by containment dikes. (*See* Rainier Mot. for Partial SJ (Dkt. # 29) at

8  15.) Stormwater from these areas drains into catch basins, is pumped into the

9  11,750-gallon oil/water separator tank, and then drains into a sanitary sewer. (*See* 2d

10  Horner Decl. ¶ 13.) Outside the diked area are eight small drains covered by grates and

11  one larger hole in the pier, all of which drain directly to Elliot Bay. (*See* 2d Horner Decl.

12  ¶ 15, Attach. A at 1, 13; SWPPP at 6; Lider Decl. ¶ 2, Ex. B at 23.)

13       Before trial, the parties reached a settlement in the form of a proposed consent

14  decree. (Prop. Consent Decree (Dkt. # 98-1).) On March 3, 2016, the court entered the

15  consent decree ("Consent Decree" or "Decree"). (Consent Decree (Dkt. # 100).) The

16  Consent Decree requires Rainier to undertake a number of environmental restoration and

17  mitigation projects by certain deadlines. (*See* Consent Decree ¶¶ 7(a)-(m).) The Decree

18  also requires Rainier to pay $540,000, divided between the Puget Sound Stewardship and

19  Mitigation Fund of the Rose Foundation for Communities and the Environment ("the

20  Rose Foundation") and Soundkeeper's attorneys' fees. (*Id.* ¶¶ 9(a)-(b).)

21       The parties agree that Rainier has completed many of the tasks required by the

22  Consent Decree. (Resp. (Dkt. # 104) at 16 ("Rainier complied with all items of the

consent decree except for item 7(f)"); *see generally* Mot.) At issue is Rainier's level of

compliance with Paragraph 7(f) and whether Rainier's noncompliance is excused by a

force majeure event pursuant to Paragraph 10(c).

Paragraph 7(f) requires the following:

> Not later than June 30[], 2016, Rainier Petroleum will implement measures to prevent any stormwater from the portion of Pier 15 (also known as the Facility's fueling dock or pier) on which Rainier Petroleum operates (approximately the western half of the pier) from discharging to Elliott Bay. Rainier Petroleum will plug existing holes in its pier that presently discharge directly to Elliott Bay, install curbs, berms, and/or barriers as required to prevent sheet flow of stormwater from its portion of the pier to Elliott Bay, and otherwise ensure adequate stormwater collection and conveyance infrastructure exists to capture the stormwater from the portion of the pier on which Rainier Petroleum operates and direct it to the sanitary sewer. Not later than June 30, 2016, Rainier Petroleum will send Soundkeeper written confirmation describing the measures taken to implement the requirements of this paragraph.

(Consent Decree ¶ 7(f)).

"A force majeure event is any event outside the reasonable control of Rainier

Petroleum that causes a delay in performing tasks required by this decree that cannot be

cured by due diligence." (*Id.* ¶ 10.) Examples of a force majeure event include

"[a]ctions or inactions of third parties over which [Rainier] has no control." (*Id.* ¶ 10(c).)

A delay caused by a force majeure event is not a violation of the Consent Decree as long

as Rainer "notifies Soundkeeper of the event; the steps that Rainier . . . will take to

perform the task; the projected time that will be needed to complete the task; and the

measures that have been taken or will be taken to prevent or minimize any impacts to

stormwater quality resulting from delay in completing the task." (*Id.* ¶ 10.) If a force

majeure event occurs, Rainier must notify Soundkeeper "as soon as reasonably possible

but, in any case, no later than fifteen days after the occurrence of the event." (*Id.*) The Consent Decree requires such notifications to be made in writing, which includes email. (*Id.* ¶ 17.)

After submitting the proposed consent decree, Rainier took steps to fulfill the Decree's required restoration and mitigation projects. (*See, e.g.*, Kovacich Decl. ¶¶ 5-7.) Because Rainier leases the pier from Exxon, Rainier's Dan Kovacich[1] contacted Exxon on January 13, 2016, to request permission for the pier modifications pursuant to Paragraph 7(f). (*Id.* ¶ 5.) At that time, Exxon "was not agreeable to the structural pier modifications required to implement the drainage without investigating the modifications in more detail." (*Id.*) The court did not enter the Consent Decree until March 3, 2016. Mr. Kovacich states that he followed up with Exxon about the modifications required under Paragraph 7(f) again on February 11, 2016, and April 13, 2016. (*Id.* ¶¶ 6, 8.) Each time, Exxon withheld its consent to pier modifications until Rainier presented modification plans that Exxon could investigate. (*Id.*)

On May 5, 2016, Rainier representatives met with Soundkeeper representatives. (*Id.* ¶ 9; Auer Decl. (Dkt. # 105) ¶ 4.) At this meeting, Mr. Kovacich and Mike Auer[2] told Soundkeeper about "the challenges Rainier was facing with obtaining approval from Exxon Mobil to do the improvements" and Rainier's "trouble obtaining permission from its dock partner, Shell." (Kovacich Decl. ¶ 9; Auer Decl. ¶ 4.) At the December 13,

---

[1] Mr. Kovacich is the Vice President of the Maritime Division of Maxum Petroleum, Rainier's parent corporation. (*Id.* ¶ 2.)

[2] Mr. Auer is the Environmental Compliance Manager for Maxum Petroleum. (Auer Decl. ¶ 2.)

1  2017, evidentiary hearing, Katelyn Kinn[3] of Soundkeeper explained that, although

2  Rainier told Soundkeeper at the May 5, 2016, meeting that it was having difficulties

3  complying the Paragraph 7(f), Rainier did not give any details on these difficulties.

4  Nonetheless, based on this meeting, Rainier believed "Soundkeeper acknowledged that

5  there were challenges beyond Rainier's reasonable control and agreed to forego enforcing

6  Item 7f of the Consent Decree pending Rainier getting satisfactory stormwater sampling

7  results from one or two 'substantially identical' dock holes as determined by Ecology."

8  (Auer Decl. ¶ 5.)  Soundkeeper claims it never agreed to forego enforcing Paragraph 7(f).

9  (Kinn Decl. ¶ 8.)  Rather, Soundkeeper "agreed that it would accept a less expensive

10  treatment option" than what Paragraph 7(f) originally required "so long as [it was]

11  certified by an engineer to meet permit benchmarks if Rainier Petroleum would agree to

12  waive" a certain permit condition.  (*Id.* ¶ 6.)  Rainier's outside counsel, however, failed to

13  respond after the parties agreed, preventing the parties from memorializing this suggested

14  modification.  (*Id.*)

15      Rainier and Soundkeeper met again on June 3, 2016.  (Auer Decl. ¶ 6; Kinn Decl.

16  ¶ 8.)  During this meeting, Rainier conveyed that "Shell, which operates on and leases the

17  eastern half of Pier 15 from ExxonMobil[], would not agree to cooperate on any pier

18  upgrades."  (Kinn Decl. ¶ 8.)  Soundkeeper emphasized that Rainier "was not on track to

19  //

20  //

21  _____

22  [3] Ms. Kinn's "duties include acting as co-counsel in Puget Soundkeeper's clean water litigation as well as tracking compliance with Puget Soundkeeper's consent decrees."  (Kinn Decl. (Dkt. # 102) ¶ 1.)

fulfill consent decree requirement 7.f. and that [] Soundkeeper could not and would not

agree to forego enforcement of this requirement." (*Id.*)

On June 7, 2016, Mr. Auer followed up with Soundkeeper via email, stating:

> Regarding our Pier water discussion, we have experienced difficulties
> unforeseen when we entered the Consent Decree agreement and beyond our
> control. Our path towards satisfying stipulation 7.f. of our agreement
> requiring this pier water be redirected has been problematic due to parties
> such as our wastewater permitting agency King County, our landlord Exxon
> Mobil, and our dock partner Shell. As discussed, we would like to avoid
> . . . potentially a force majeure situation.

(Auer Decl. ¶ 4, Ex. B at 9; *see also* Kinn Decl. ¶ 9.) The June 7, 2016, email between

Mr. Auer and Ms. Kinn is the first time Rainier recorded its view of a force majeure

event in writing.

Also in that June 7 email, Mr. Auer suggested that Rainier "implement operational

[best management practices] to ensure pollutant parameters for all benchmarks are met,"

which consisted of "routine sweeping of the facility surfaces" and additional sampling.

(Auer Decl. ¶ 4, Ex. B at 9.) Ms. Kinn responded on June 10, 2016, that "Rainier's

suggestions to sweep and sample runoff from the pier are an excellent starting point," but

"unlikely" to be "enough on its own to balance Soundkeeper's interests." (*Id.* at 5.) Ms.

Kinn also explained that "Soundkeeper may be willing to consider potential alternatives"

to the terms of Paragraph 7(f), "but any change to this requirement will require Rainier to

agree to an alternative of substantial value to Soundkeeper (and to water quality)." (*Id.* at

5; *see* Kinn Decl. ¶ 10.) Mr. Auer contends that "[b]ased on [Rainier's] May 5, 2016,

June 3, 2016, and June 10, 2016, discussions with Soundkeeper, Rainier moved forward

with implementing operational and structural [best management practices] at the pier to

1  mitigate any potential damage caused by Exxon Mobil withholding permission for the

2  improvements." (Auer Decl. ¶ 8.)

3       Between May 2016 and January 2017, Rainier alleges that it had "numerous

4  interactions" with consultants regarding pier modifications, although it is not clear what

5  those interactions resulted in. (*Id*.) By the end of 2016, Soundkeeper was convinced that

6  Rainier had "no plan" to come into compliance with Paragraph 7(f). (*See* Kinn Decl. ¶ 15

7  ("Throughout 2016, none of the communications that I received from Mr. Kovacich or

8  Mr. Auer indicated to me that Rainier [] had made any apparent progress toward

9  capturing and treating or diverting its pier runoff.").) Thus, on January 3, 2017—five

10  months after Rainier was required to fully implement Paragraph 7(f)—Soundkeeper

11  invoked the Consent Decree's dispute resolution provision. (1st Tonry Decl. (Dkt. # 103)

12  ¶ 4, Ex. 2.)

13       The parties met again on January 30, 2017. (Kovacich Decl. ¶ 11; Auer Decl.

14  ¶ 12; 1st Tonry Decl. ¶ 5.) At that meeting, Mr. Kovacich and Mr. Auer contend that

15  Rainier reiterated its difficulties with Exxon, Shell, and the County. (Kovacich Decl.

16  ¶ 11; Auer Decl. ¶ 12; *see also id.* ¶ 3, Ex. A at 2 (stating via email on February 6, 2017,

17  that Rainier told Soundkeeper on January 30, 2017, that "there are some challenges

18  outside Maxum's reasonable control with our landlord ExxonMobil, our fellow pier

19  operator Shell, and potentially King County who has voiced concern over the additional

20  water volume to their already taxed sewer system").) "Rainier indicated that these were

21  actions/events outside of its control but that it would continue moving towards

22  implementing the improvements in an effort to satisfy the consent decree." (Kovacich

Decl. ¶ 11.) Rainier contends that it told Soundkeeper it had an engineer working on the

modifications and that "it was optimistic that if the necessary approvals and permits were

obtained, . . . Rainier could implement the modifications by September 30, 2017." (*Id.*)

Rainier claims that Soundkeeper did not object to this timeline. (*Id.*) According to

Soundkeeper's outside counsel, Claire Tonry, Rainier "did not have a proposal for

coming into compliance with the Consent Decree and was hoping that Soundkeeper could

come up with a solution for the problem." (1st Tonry Decl. ¶ 5.)

After the January 2017 meeting, Rainier worked with contractors on items related

to the pier. (Auer Decl. ¶¶ 13-15.) In April 2017, Rainier began collecting contractor

bids for a stormwater containment system. (*Id.* ¶ 14). On May 26, 2017, Rainier

obtained project bids. And on July 12, 2017, Exxon gave Rainier permission to begin the

work required under Paragraph 7(f) on September 1, 2017. (Kovacich Decl. ¶ 15.) At

the December 13, 2017 evidentiary hearing, Rainier testified that, as of November 2017,

it has all necessary permits from the City of Seattle ("the City") and King County ("the

County") and all necessary permission from third-parties to complete the Paragraph 7(f)

pier modifications.

On July 27, 2017, Soundkeeper brought the instant motion, contending that

Rainier is in violation of Paragraph 7(f) of the Consent Decree.[4] (*See* Mot.)

Soundkeeper requests that the court find Rainier in civil contempt for violating Paragraph

//

---

[4] The Consent Decree provides that "the parties may apply to the [c]ourt for any further
order that may be necessary to enforce compliance with this decree or to resolve any dispute
regarding the terms or conditions of this decree." (Consent Decree ¶ 11.)

1 | 7(f), impose monetary sanctions, award attorneys' fees and costs, and permit limited

2 | discovery to resolve any factual disputes. (*See id.*) Soundkeeper also seeks a

3 | modification of Paragraph 7(f) to permit Rainier to discharge stormwater from Pier 15 if

4 | it first treats the stormwater and to extend the termination date of the Consent Decree

5 | until one year after Rainier complies with Paragraph 7(f). (*Id.* at 13.)

6 |      Rainier agrees that it has not met the requirements of Paragraph 7(f), but contends

7 | that force majeure events have prevented it from doing so and that it has nonetheless

8 | substantially complied. (Resp. at 15-18.) Rainier therefore opposes a civil contempt

9 | order, sanctions, attorneys' fees, and reopening discovery. (*Id.* at 15-22.) Rainier agrees,

10 | however, that the court should modify Paragraph 7(f). (*Id.* at 22-23.) The court now

11 | addresses the motion.

12 | **III.    ANALYSIS**

13 | **A.    Preliminary Matters**

14 |      Before the court analyzes the merits of Soundkeeper's motion, it addresses

15 | Rainier's over-length response brief and surreply, as well as the parties' evidentiary

16 | objections.

17 |     1.  Over-Length Response Brief

18 |      Soundkeeper asks the court to "strike the portion of Rainier's response brief that

19 | exceeds [Local Civil Rule] 7(e)(4)'s twelve-page limit." (Reply (Dkt. # 109) at 2.) The

20 | Local Civil Rules for the Western District of Washington provide that certain "motions

21 | noted under LCR 7(d)(3) and briefs in opposition shall not exceed twelve pages." Local

22 | Rules W.D. Wash. LCR 7(e)(4). Over-length briefs are "disfavored." *Id.* LCR 7(f).

"The court may refuse to consider any text, including footnotes, which is not included within the page limits." *Id.* LCR 7(e)(6). To file a brief longer than the rule allows, a party must file a motion with the court "no later than three days before the underlying motion or brief is due" and "request a specific number of additional pages." *Id.* LCR 7(f)(1)-(2).

Soundkeeper's motion is noted under Local Civil Rule 7(d)(3). Nonetheless, Rainier filed a 24-page response brief without seeking the court's leave. (*See* Resp.) Although Rainier failed to comply with the Local Rules, the court will consider the over-length portion of Rainier's response brief. Soundkeeper did not allege that it was prejudiced by the over-length brief. (*See* Reply at 2.) Moreover, Soundkeeper was able to respond to Rainier's arguments in its reply brief and at the evidentiary hearing. Although the court will consider the over-length portions of Rainier's response brief, the court cautions Rainier that it will consider appropriate sanctions for future disregard of applicable court rules.

2. Surreply

The Local Civil Rules also limit the filing of a surreply. *See* Local Rules W.D. Wash. LCR 7(g). A party "may file a surreply requesting that the court strike" "material contained in or attached to a reply brief." *Id.* The surreply "shall be strictly limited to addressing the request to strike," and "[e]xtraneous argument or a surreply filed for any other reason will not be considered." *Id.* LCR 7(g)(2). In its surreply, Rainier (1) addresses its over-length response brief, and (2) responds to Soundkeeper's request to strike portions of certain declarations. (*See* Surreply (Dkt. # 113) at 2-4.) Neither issue

1  is within the acceptable scope of a surreply.  For this reason, the court does not consider

2  Rainier's surreply.

3       3.  Evidentiary Objections

4       The parties raise a number of objections to the evidence presented by declaration.

5  Rainier objects to the following testimony in Ms. Tonry's declaration as inadmissible

6  hearsay: "Mr. Bilanko [Rainier's former counsel] responded that Rainier Petroleum's

7  existing sewer permit would authorize the additional volume of stormwater from the

8  pier." (Resp. at 13; *see also* 1st Tonry Decl. ¶ 2; Bilanko Decl. (Dkt. # 106) ¶ 2 (stating

9  that Mr. Bilanko was one Rainier's attorneys in this matter).)  Rainier also objects to

10  Paragraph 8 of Ms. Tonry's declaration, in which she represents what Mr. Auer and Mr.

11  Kovacich said to her during a telephone conference, as hearsay, "particularly [because]

12  Rainier expressly denies that such statements were made." (Resp. at 14; *see also* 1st

13  Tonry Decl. ¶ 8.)  Rainier argues that because "Soundkeeper failed to identify an

14  exemption for the hearsay statement and produced no evidence of it, th[e c]ourt should

15  disregard" the statement. (Resp. at 14.)  In reply, Soundkeeper contends that the

16  statements are admissible as statements of party opponents. (Reply at 3 (citing Fed. R.

17  Evid. 801(d)(2)).)

18       Federal Rule of Evidence 801(d) provides that a statement is not hearsay if it

19  "is offered against an opposing party and . . . was made by the party in an individual or

20  representative capacity," "by a person whom the party authorized to make a statement on

21  the subject," or "by the party's agent or employee on a matter within the scope of that

22  relationship and while it existed." Fed. R. Evid. 801(d)(2)(A), (C)-(D).

1    The court overrules Rainier's objections. Under Federal Rule of Evidence 801(d),

2    these statements are not hearsay because Mr. Bilanko, as Rainier's outside counsel, was

3    authorized to make a statement on subjects related to settlement; furthermore, Mr. Auer

4    and Mr. Kovacich made their statements as Rainier's employees and within the scope of

5    their employment. In any event, the court notes that Ms. Tonry's recollection of Mr.

6    Bilanko's alleged statement regarding the stormwater permit does not factor into the

7    court's analysis. *See infra* § III.B.

8        Soundkeeper also seeks to exclude several pieces of Rainier's evidence. First,

9    Soundkeeper requests that the court strike Paragraphs 4 and 5 of Mr. Bilanko's

10   declaration because "they purport to disclose information protected [by] Washington's

11   Mediation Act, RCW 7.07, and the parties' mediation agreement." (Reply at 2-3; *see*

12   *also* Bilanko Decl. ¶¶ 4-5.)

13       "Washington's Uniform Mediation Act applies a privilege to 'mediation

14   communication[s],' which are 'not subject to discovery' and are not 'admissible in

15   evidence in a proceeding.'"[5] *W. & Clay, LLC v. Landmark Am. Ins. Co.*,

16   No. C09-1423MJP, 2010 WL 1881880, at *1 (W.D. Wash. May 10, 2010) (quoting

17   RCW 7.07.030(1)). "Mediation communications" include statements made during a

18   mediation or statements made "for the purposes of considering, conducting, participating

19   in, initiating, continuing, or reconvening a mediation." RCW 7.07.010(2). However, a

20   //

21   _____

     [5] "[A] federal court is compelled to apply the state law privilege of the state that supplies the rule
22   of the decision." *Microsoft Corp. v. Immersion Corp.*, No. C07-0936RSM, 2008 WL 11343462,
     at *2 (W.D. Wash. Mar. 24, 2008).

party may waive the privilege. *Cf. Stuart v. Korey*, No. C16-1815RSM, 2017 WL 1496360, at *2 (W.D. Wash. Apr. 26, 2017) (finding that the mediation privilege did not apply when the party seeking to invoke the privilege "necessarily opened the door to such communications by bringing this action").

The court overrules Soundkeeper's objection. Soundkeeper waived the privilege to the mediation communications involving Mr. Bilanko by first relying on statements Mr. Bilanko made during the mediation. (*See* 1st Tonry Decl. ¶ 2); *see also Stuart*, 2017 WL 1496360, at *2 ("The Court is convinced that Mr. Stuart has waived the mediation privilege with regard to these specific paragraphs through his own declaration," which discusses the settlement). The court notes once again that it does not rely on these statements in analyzing the substantive issues in Soundkeeper's motion. *See infra* § III.B.

Soundkeeper also objects to certain statements in Mr. Auer's declaration and Mr. Kovacich's declaration as inadmissible hearsay. (Reply at 3.) Specifically, Soundkeeper seeks to strike Mr. Auer's statements regarding the Washington Department of Ecology ("Ecology") informing Rainier that it was one of only a few facilities with no permit violations and Mr. Kovacich's statements regarding Exxon's failure to give permission for the dock improvements. (*Id.*; Auer Decl. ¶¶ 9, 19-20; Kovacich Decl. ¶¶ 5-8.)

Mr. Auer's representation of Ecology's statements are inadmissible hearsay. Rainier offered Ecology's statements to prove the truth of the matter asserted—that Rainier had no permit violations, or at least that Rainier improved its environmental compliance in the time since the court entered the Consent Decree. (Resp. at 12-13; Auer

1  Decl. ¶¶ 9, 19-20.)  Moreover, Ecology's statements do not fall under any hearsay

2  exception.  The court, therefore, will not consider these statements.

3  Mr. Kovacich's discussion of Exxon's statements is a closer call.  On the one

4  hand, Rainier presents Exxon's statements to prove that Exxon refused to consent to pier

5  modifications.  (Resp. at 5; Kovacich Decl. ¶¶ 5-8.)  Using Exxon's statements for this

6  purpose would be hearsay.  On the other hand, Mr. Kovacich's representations are

7  non-hearsay if used to show that Rainier spoke with Exxon on a number of occasions and

8  that Rainier had the impression that it could not improve the Facility without further

9  consent.  The court will consider Mr. Kovacich's statements only for the permissible non-

10  hearsay purposes.

11  The court now turns to the merits of Soundkeeper's motion.

12  **B.    Compliance with Paragraph 7(f)**

13  1.  Civil Contempt

14  Soundkeeper requests that the court hold Rainier in civil contempt of the Consent

15  Decree for failing to comply with Paragraph 7(f) by June 30, 2016.  (Mot. at 7-8; *see also*

16  Consent Decree ¶ 7(f).)  Soundkeeper contends that Rainier has not substantially

17  complied with the Consent Decree because "Rainier's ongoing discharge of toxic

18  stormwater pollution from the pier is a significant violation." (Mot. at 8.)  Soundkeeper

19  further contends that no force majeure event prevented Rainier from complying with

20  Paragraph 7(f) (*id.* at 9-10) despite Rainier's assertion that acts of third parties—Exxon,

21  Shell, the City, the County—have kept it from full compliance with Paragraph 7(f) in the

22  time required (Resp. at 15-18).

"Civil contempt is a refusal to do an act the court has ordered for the benefit of a party . . . ." *Bingman v. Ward*, 100 F.3d 653, 655 (9th Cir. 1996) (internal quotation marks omitted). A court may invoke its civil contempt power for two reasons: (1) "to coerce the defendant into compliance with the court's order," and (2) "to compensate the complainant for losses sustained." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (internal quotation marks omitted); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt.").

A party moving for civil contempt must prove by clear and convincing evidence that the nonmoving party violated a court order. *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013). "The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order." *Go-Video v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693, 695 (9th Cir. 1993). The district court has "wide latitude in determining whether there has been a contemptuous defiance of its order." *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984). Once the moving party has met its burden, the burden shifts to the alleged contemnor to demonstrate why it was unable to comply. *Stone v. City and Cty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992); *Arabian Gas & Oil Dev. Co. v. Wisdom Marines Lines, S.A.*, No. 16-cv-03801-DMR, 2017 WL 4390184, at *4 (N.D. Cal. Oct. 3, 2017) ("If the moving party establishes a violation of a specific and definite court order, the

//

1  burden shifts to the non-moving party to prove that it took all reasonable steps within its

2  power to insure compliance.").

3      Both parties agree that Rainier has not strictly complied with Paragraph 7(f),

4  which requires Rainier to "ensure adequate stormwater collection and conveyance

5  infrastructure exists to capture the stormwater . . . and direct it to the sanitary sewer" no

6  later than June 30, 2016.[6] (*See generally* Mot.; Resp. at 15-18; Consent Decree ¶ 7(f).)

7  In addition to the parties' agreement, the evidence before the court independently

8  demonstrates Rainier's failure to strictly comply. (*See, e.g.*, Auer Decl. ¶ 12; Kovacich

9  Decl. ¶ 11; Kinn Decl. ¶ 17; 1st Tonry Decl. ¶ 5) Rainier likewise did not dispute its

10  noncompliance at the evidentiary hearing. Soundkeeper has therefore proven, by clear

11  and convincing evidence, that Rainier violated the Consent Decree.

12      To avoid liability, Rainier must show that its violation is excused by a recognized

13  defense. *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir.

14  2006). Rainier asserts three defenses here: (1) Rainier has substantially complied with

15  the Consent Decree in spite of its failure to meet the specific requirements of Paragraph

16  7(f); (2) a force majeure event occurred, Rainier followed the required procedures in

17  //

18  //

19  //

20  _____

21  [6] "[S]ince consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts . . . ." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236-37 (1975) (footnote omitted). "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971) (footnote omitted).

addressing such an event, and thus, Rainier's performance is excused; and (3) Rainier has a present inability to comply.[7] The court addresses each in turn.

### a. Substantial Compliance

"[S]ubstantial compliance with a court order is a defense to an action for civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) ("Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply."). If the party who has violated the court order has taken all reasonable steps to comply with the order, "technical or inadvertent violations . . . will not support a finding of civil contempt." *Gen. Signal*, 787 F.2d at 1380. Contempt is inappropriate when a person's action is "based on a good faith and reasonable interpretation of the court's order." *McCord*, 452 F.3d at 1130.

Substantial compliance is an imprecise standard "that cannot be satisfied by reference to one particular figure, while ignoring alternative information." *Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1122 (9th Cir. 2009). The standard is not "susceptible of a mathematically precise definition." *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011) (quoting *Joseph A. v. N.M. Dep't of Human Servs.*, 69 F.3d 1081, 1085 (10th Cir. 1995)). Rather, to determine whether a party substantially

---

[7] Although Rainier does not expressly argue that it is presently unable to comply with Paragraph 7(f), its arguments suggest that Rainier invokes this defense. (*See, e.g.*, Resp. at 16 (stating that Paragraph 7(f) "required Rainier to make structural modifications to property that it does not own").)

complied with a consent decree, the court must take a "holistic view of all the available information," to see if the level of compliance "overall was substantial, notwithstanding some minimal level of noncompliance." *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1122. At its base, the court must determine if the noncompliance "defeats the object of the parties entering into the contract." *Jeff D.*, 643 F.3d at 284.

The fundamental purpose of the Consent Decree is to protect Elliot Bay from the Facility's polluted stormwater discharges. (*See* Auer Decl. ¶ 10 ("cleaner stormwater runoff from the pier . . . [is] the Consent Decree's ultimate goal.").) More than one year after compliance was required, however, Rainier's "dock discharges are the most polluted discharges ever sampled at Rainier's facility and grossly exceed the levels that are protective of Soundkeeper's interests." (Mot. at 8; *see* Hearing Exs. 2-5.) Rainier's performance does not qualify as a "minimal level of noncompliance." *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1122.

Rainier claims that, even though its stormwater discharges still exceed permit allowances, it has implemented numerous mitigation and environmentally protective measures to lessen the damage from Exxon's refusal to allow the pier modifications. (Resp. at 16.) Rainier further claims it "took reasonable steps to ensure that once Exxon[] approved the modifications, it would be ready to implement them in a timely manner, including engaging contractors to evaluate the structural components of the modifications and conduct the required volume calculations." (*Id*. at 15.) Rainier points out that within 30 days of receiving Exxon's tentative approval for the pier modifications, "Rainier obtained the final water volume calculations, submitted its permits, and obtained

1   bids." (*Id.*) At the evidentiary hearing, Mr. Auer testified that the stormwater on the

2   southern portion of the pier is nearly 90% captured. Mr. Auer admitted, however, that

3   Paragraph 7(f) relates to the pier's northern portion, which Rainier has not yet modified.

4         In weighing Rainier's level of compliance, the court refers to *Labor/Community*

5   *Strategy Center.* 564 F.3d at 1121-23. There, the plaintiff argued that the Los Angeles

6   County Metropolitan Transportation Authority ("MTA") was not in substantial

7   compliance with a consent decree because its buses were overcrowded past the decree's

8   termination date. *Id.* at 1117. In upholding the district court's finding that MTA had

9   substantially complied with the consent decree, the Ninth Circuit noted that MTA was in

10   full compliance with the other two "core" requirements of the consent decree and that

11   MTA was in 94% to 99% compliance with the overcrowding requirement. *Id.* at

12   1121-22. This level of noncompliance was "de minimis in relation to the overall scheme

13   of things." *Id.* at 1123.

14         In contrast, the core requirement of the Consent Decree is to prevent the flow of

15   polluted stormwater from the Facility into Elliott Bay. (*See generally* Consent Decree;

16   *see also* Auer Decl. ¶ 10.) Rainier has not done that. Although Rainier has completed

17   significant environmental stewardship work and many of its Consent Decree

18   requirements, the uncontroverted evidence shows that the Facility's discharges are at

19   least as polluted today as when the court entered the Consent Decree. (*See* Hearing Exs.

20   2-5; *see also* Mot. at 8.) Such noncompliance cannot be said to be "minimal." Rather, it

21   is fundamental, and defeats the object of the Consent Decree: protecting Elliot Bay from

22   Rainier's polluted stormwater discharges.

1   Taking a holistic view of Rainier's level of compliance, the court finds that

2   Rainier is not in substantial compliance with the Consent Decree.

3          *b. Force Majeure*

4          Rainier next argues that, to the extent it did not comply with Paragraph 7(f), it

5   should be excused because a force majeure event—Exxon's resistance to pier

6   modifications—rendered compliance impossible. (Resp. at 15.) In contrast,

7   Soundkeeper argues that no force majeure event occurred and that even if one did,

8   "Rainier has not satisfied the procedure and substantive requirements of the Consent

9   Decree's force majeure provision." (Mot. at 9.) For Soundkeeper's two reasons, the

10  court finds that Rainier's noncompliance is not excused by a force majeure event.

11         First, Exxon's refusal to consent to pier modifications is not a force majeure event.

12  The Consent Decree defines a force majeure event as "any event outside the reasonable

13  control of Rainier Petroleum that causes a delay in performing tasks required by this

14  decree that cannot be cured by due diligence." (Consent Decree ¶ 10.) Rainier did not

15  exercise due diligence, which would have cured Exxon's refusal.

16         On January 13, 2016—before the court entered the Consent Decree—Rainier

17  asked Exxon to approve pier modifications. (Resp. at 5.) Exxon told Rainier that it

18  would not consent to any modifications until Exxon could evaluate a formal proposal.

19  (*Id.*) True to its word, Exxon continued to withhold its consent in subsequent

20  conversations with Rainier, reiterating that Rainier needed to provide a formal proposal

21  first. (*Id.*) Rainier did not attempt to obtain construction bids until April 2017. (Auer

22  Decl. ¶ 15.) Upon hearing that Rainier was obtaining bids, on May 8, 2017, Exxon

"indicated that it was receptive to the containment work." (*Id.*) Rainer received bids for

the project on May 26, 2017. (*Id.*) Shortly thereafter, Rainier provided the bids to

Exxon, and Exxon approved Rainier to begin containment work. (*Id.* ¶ 16.)

In short, Rainier knew two months before the court entered the Consent Decree

that Exxon's approval depended on Rainier providing a formal bid. And yet, Rainier

waited until April 2017—almost 10 months after Rainier should have fully implemented

Paragraph 7(f)—to begin obtaining bids. Rainier did not act in earnest to provide Exxon

with a formal proposal until after Soundkeeper invoked the Consent Decree's dispute

resolution provision on January 3, 2017. (*See* Auer Decl. ¶¶ 4-16; *see also* Kinn Decl. ¶

15.) Accordingly, the court finds that Rainier did not exercise due diligence, which

would have cured Exxon's lack of consent. Therefore, Exxon's refusal is not a force

majeure event that excuses Rainier's noncompliance with Paragraph 7(f).

Second, even if Exxon's refusal is a force majeure event, Rainier did not comply

with the Consent Decree's notice requirements, thus preventing Rainier from invoking

the defense. Failure to comply with a force majeure provision's notice requirements can

preclude a party from using the defense. *See, e.g.*, *United States v. Alshabkhoun*, 277

F.3d 930, 935-36 (7th Cir. 2002) (denying the force majeure defense to the defendant

because he failed to notify the plaintiff of the force majeure); *United States v. Wheeling–

Pittsburgh Steel Corp.*, 818 F.2d 1077, 1088 (3rd Cir. 1987) (holding that failure to give

adequate notice of force majeure rendered that defense unavailable to the defendant).

The earliest Rainier notified Soundkeeper of the force majeure event was on May

5, 2016. (*See* Kovacich Decl. ¶ 9; Auer Decl. ¶ 4; Resp. at 17.) Assuming Exxon's April

13, 2016, refusal is a force majeure event, Rainier had no more than 15 days to "notif[y]

Soundkeeper of the event; the steps that Rainier Petroleum will take to perform the task;

the projected time that will be needed to complete the task; and the measures that have

been taken or will be taken to prevent or minimize any impacts to stormwater quality

resulting from delay in completing the task." (Consent Decree ¶ 10.) Notifications under

the Consent Decree also must be in writing. (*Id.* ¶ 17.)

Rainier's May 5, 2016, communication does not satisfy the elements. It is not

clear what Rainer told Soundkeeper at the May 5 meeting because neither party recorded

it in writing. At most, Rainier informed Soundkeeper that it was encountering problems

with King County, Exxon, and Shell, which "potentially" amount to "a force majeure

situation." (Auer Decl. ¶ 4, Ex. B at 9.) This notice came more than 15 days after the

Exxon's April 13, 2016, refusal to consent (and much longer after Exxon's January 13,

2016, and February 11, 2016, refusals). (*See* Kovacich Decl. ¶¶ 5-7.) Rainier also did

not notify Soundkeeper of the steps it would take to perform Paragraph 7(f), or the

projected time it needed to complete Paragraph 7(f). (*See* Consent Decree ¶ 10; Auer

Decl. ¶ 4, Ex. B at 9-10.) Lastly, Rainier's May 5, 2016, communication was not put into

writing until a June 7, 2016, email purporting to summarize the month-old conversation.

(*See generally* Auer Decl. ¶ 4, Ex. B at 8-10.)[8] Even under a favorable reading, Rainier

failed to follow the notification requirements.

_____

[8] Even though it did not do so within the 15 days period, Rainier informed Soundkeeper of
measures Rainier was undertaking to mitigate Exxon's refusal. (Auer Decl. ¶ 4, Ex. B at 9
(stating that Rainier planned to implement operational best management practices to limit
pollution, including routine vacuum sweeping of the pier and sampling the pier runoff).) That

1    Thus, because Rainier did not exercise due diligence, which would have cured

2    Exxon's refusal and because Rainier failed to follow the force majeure provision's notice

3    requirements, the court finds that Rainier's noncompliance with Paragraph 7(f) is not

4    excused by a force majeure event.

5         *c. Present Inability to Comply*

6         "A present inability to comply is a complete defense to civil contempt." *Arabian*

7    *Gas*, 2017 WL 4390184, at *5 (citing *United States v. Rylander*, 460 U.S. 752, 757

8    (1983)). "Where compliance is impossible, neither the moving party nor the court has

9    any reason to proceed with the civil contempt action." *Rylander*, 460 U.S. at 757.

10   Showing an inability to comply presents "a rigorous and demanding standard." *Id.* The

11   contemnor must show "categorically and in detail why [it] is presently unable to comply

12   with the court's order," and if its inability "is self-induced, it cannot avoid civil

13   contempt." *Id.*

14        Rainier did not expressly argue this defense and the court finds that it does not

15   apply here.

16        Therefore, without any defense to its violation of Paragraph 7(f) of the Consent

17   Decree, the court holds Rainier in contempt of the court's order. The court now turns to

18   Soundkeeper's request for civil contempt sanctions and attorneys' fees and costs.

19   //

20   //

21   ─────────────────────
     said, Rainier's proposed mitigation measures are already required by the Consent Decree.
22   (Consent Decree ¶¶ 7(i)(i), 7(l).)

1    2.  Sanctions and Attorneys' Fees and Costs

2        a.  Sanctions

3        The finding of contempt and the imposition of monetary sanctions are independent

4    inquiries. *See Gen. Signal*, 787 F.2d at 1379-80 (addressing the contempt finding and the

5    contempt sanctions separately); *Ahearn*, 721 F.3d at 1129 (stating the party did not

6    dispute a finding of contempt but disputed the award of sanctions for the contempt);

7    *Arabian Gas*, 2017 WL 4390184, at *6 (stating that a court may impose one of two kinds

8    of sanctions if a court finds a party in civil contempt).  A sanction imposed after a finding

9    of contempt may be coercive or compensatory. *See Gen. Signal*, 787 F.2d at 1381.

10   "Because civil compensatory sanctions are remedial, they typically take the form of

11   unconditional monetary sanctions; whereas coercive civil sanctions, intended to deter,

12   generally take the form of conditional fines." *Shell Offshore*, 815 F.3d at 629.  "When a

13   fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to

14   purge." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994).

15   Compensatory sanctions should be payable to the aggrieved party on evidence of the

16   amount of losses, whereas coercive sanctions "should be payable to the court, and the

17   amount of the award should be determined" by considering the "character and magnitude

18   of the harm threatened by continued contumacy, and the probable effectiveness of any

19   suggested action." *Gen. Signal*, 787 F.2d at 1380 (citing *United States v. United Mine

20   Workers of Am.*, 330 U.S. 258, 304 (1947)).  Civil contempt sanctions—designed to

21   compel future compliance with a court order and to be coercive and avoidable through

22   obedience—"may be imposed in an ordinary civil proceeding upon notice and an

1 opportunity to be heard." *Bagwell*, 512 U.S. at 827. The court should impose the

2 minimum sanction necessary to secure compliance. *United States v. Bright*, 596 F.3d

3 683, 696 (9th Cir. 2010).

4       Soundkeeper requests that the court impose two monetary sanctions on Rainier:

5 (1) $50,000 to the Rose Foundation to fund environmental restoration projects, and (2)

6 $10,000 a month to the court for each month after September 30, 2017, that Rainier fails

7 to comply with Paragraph 7(f). (Mot. at 11.) Soundkeeper relies on a nearly

8 two-year-old report from its economic expert, Jonathan Shefftz, to prove Rainier's

9 economic benefit from not yet making the pier modifications. (1st Tonry Decl. ¶ 12, Ex.

10 7 ("Shefftz Rpt.").)

11       Rainier argues that the requested sanctions are punitive—and therefore criminal—

12 and unwarranted. (Resp. at 20.) Rainier first states that its "improved environmental

13 stewardship does not correlate with a $50,000[.00] monetary penalty." (*Id.*) Rainier then

14 argues that sanctions ignore that Rainier "could not have legally proceeded with the

15 structural modifications necessary to satisfy item 7(f) until the property owner approved."

16 (*Id.*) Finally, Rainier argues that sanctions for each month after September 30, 2017, are

17 impractical because Rainier cannot start those modifications without permits from the

18 City and the County. (*Id.* at 20-21.)

19       Although the parties represented at the evidentiary hearing that it would cost over

20 $50,000 to monetize the harm that Rainier's 18 months of noncompliance has caused to

21 Puget Sound, the court finds that $50,000 is an appropriate compensatory sanction. As

22 Soundkeeper explained at the hearing, the $50,000, payable to the Rose Foundation, will

fund two water quality improvement projects in the Puget Sound that will help offset

Rainier's noncompliance. Also at the hearing, both parties requested that the court

consider the Clean Water Act's civil penalty factors to determine the appropriate

sanction. *See* 33 U.S.C. § 1319(d). Section 1319(d) includes factors such as, "the

seriousness of the violation or violations, the economic benefit (if any) resulting from the

violation, . . . any good-faith efforts to comply with the applicable requirements, [and] the

economic impact of the penalty on the violator." *Id*. Although these factors do not

govern this case because the sanctions arise from civil contempt rather than CWA

violations, the court finds them instructive. In particular, Soundkeeper presented

evidence that Rainier has benefited over $162,000 from not properly discharging its

stormwater since April 2009; equating to roughly $30,000 for its 18 months of

noncompliance. (Mot. at 12, n.1.; 1st Tonry Decl. ¶ 12, Shefftz Rpt.) Rainier's benefit

bolsters the court's finding that a $50,000 compensatory sanction against Rainier for the

damage its noncompliance caused to Elliot Bay, payable to the Rose Foundation in the

same manner as the previous fees in the Consent Decree (Consent Decree ¶ 9(b)), is

reasonable.

The court also finds that a $10,000 coercive monthly sanction against Rainier for

each month it remains out of compliance with Paragraph 7(f) is appropriate. Rainier

must pay this amount to the court on the first day of every month beyond December 31,

2017. Soundkeeper asked for the $10,000 monthly sanction to begin after September 30,

2017. However, the goal of a coercive sanction is to motivate the contemnor with "the

opportunity to purge." *See Bagwell*, 512 U.S. at 829; *Shell Offshore*, 815 F.3d at 629

1   ("[T]he ability to purge is perhaps the most definitive characteristic of coercive civil

2   contempt."). The opportunity to purge only arises after the imposition of the purge-able

3   sanction. A $10,000 monthly sanction is well within what this Circuit has determined is

4   reasonable. *E.g.*, *Arabian Gas*, 2017 WL 4390184, at \*7 (collecting cases and finding

5   that a $500 daily fine is an appropriate coercive sanction). This sanction should not be

6   burdensome to Rainier, as Rainier explained at the hearing that it should be in full

7   compliance with Paragraph 7(f) by mid-January of 2018.

8   　　　　　　*b. Attorneys' Fees and Costs*

9   　　　　Soundkeeper seeks its attorneys' fees and costs in bringing this motion (Mot. at

10  12-13), while Rainier contends that such fees are inappropriate when it has substantially

11  complied with Paragraph 7(f) (Resp. at 21-22). In this regard, Rainier appears to treat the

12  requested attorneys' fees as tantamount to a monetary sanction. (*See id.*) Rainier

13  misunderstands Soundkeeper's claim. Soundkeeper requests its attorneys' fees and costs

14  pursuant to the Consent Decree, not as an additional compensatory sanction for civil

15  contempt. (*See* Mot. at 12-13.) When the court clarified the issue for Rainier at the

16  evidentiary hearing, Rainier did not contest that Soundkeeper is entitled to attorneys' fees

17  and costs if it is the prevailing party.

18  　　　　Paragraph 11 of the Consent Decree states, "[t]he provisions of section 505(d) of

19  the Clean Water Act, 33 U.S.C. § 1365(d), regarding awards of costs of litigation

20  (including reasonable attorney and expert witness fees) to any prevailing or substantially

21  prevailing party, shall apply to any proceedings seeking to enforce the terms and

22  conditions of this Consent Decree." (Consent Decree ¶ 11); *see also* 33 U.S.C. § 1365(d)

("The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation . . . to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate."). The court also has the discretion to award attorneys' fees and costs after a finding of civil contempt. *See Harcourt Brace v. Multistate Legal Studies*, 26 F.3d 948, 953 (9th Cir. 1994).

Under the Clean Water Act, "[t]he threshold for sufficient relief to confer prevailing party status is not high." *St. John's Organic Farm v. Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1059 (9th Cir. 2009). "If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 791-92 (1989). Even when the plaintiff wins "nominal damages," it is eligible for attorneys' fees as a prevailing party. *St. John's*, 574 F.3d at 1059.

Soundkeeper has succeeded on numerous significant issues in this litigation and is therefore a prevailing party entitled to its attorneys' fees and costs under the Consent Decree. (*See* Consent Decree ¶ 11.) Soundkeeper, however, did not brief its attorneys' fees and costs associated with its motion. (*See* Mot. at 13.) The court reserves determining Soundkeeper's attorneys' fees and costs until reviewing Soundkeeper's forthcoming accounting and motion on that topic. (*See* 12/13/2017 Min. Entry.)

3. Discovery

Soundkeeper requests the court's leave to "conduct limited discovery to the extent that the [c]ourt finds that questions of fact preclude it from granted the requested relief."

(Mot. at 2.) Rainier opposes any additional discovery. (Resp. at 24.) Because the court

held an evidentiary hearing and no questions of fact preclude the court's determinations,

the court concludes that no further discovery is necessary.

**C.     Modification of the Consent Decree**

Finally, both parties seek to modify the consent decree. Soundkeeper proposes

two modifications: "(1) as an alternative to diverting pier runoff to the sewer system,

allow Rainier to discharge pier stormwater to Elliott Bay if it is first treated in the

facility's advanced stormwater treatment system, and provided that the treatment system

is augmented to handle the increased flow volume; and (2) extend the Consent Decree's

termination date to one year following Rainier's compliance with paragraph 7(f)." (Mot.

at 13.)

Rainier agrees that the court should modify the Consent Decree, albeit differently

than Soundkeeper. (Resp. at 23.) Rainier's proposals are based on it needing permits

before it can make the pier modifications. (*Id.*) Rainier proposes that the Consent

Decree's timeline be modified in the following ways: (1) if the County and City approve

Rainier's proposal to route stormwater to the sanitary sewer, the modifications required

under Paragraph 7(f) must be completed within 60 days of the approval; but (2) if the

County and City deny the proposal, Rainer must implement procedures to route the

stormwater to Rainier's treatment system, which must be completed no later than 45 days

after Rainier obtains all necessary permits and approvals for that project. (*Id.* at 24.)

The Consent Decree "terminates May 15, 2017, or upon completion of the tasks

identified in paragraphs 7 and 9, whichever is later." (Consent Decree ¶ 13.) "Because

1  the decree contains an express expiration date for the court's retention of jurisdiction, any

2  change to that date entails a modification of the decree." *Labor/Cmty. Strategy Ctr.*, 564

3  F.3d at 1120. "A party seeking modification of a consent decree must establish that a

4  significant change in facts or law warrants revision of the decree and that the proposed

5  modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk*

6  *Cty. Jail,* 502 U.S. 367, 393 (1992). That said, "[t]he scope of a court's authority in

7  modifying a consent decree is broader than the court's authority in enforcing a consent

8  decree." *Washington v. Moniz*, No. C08-5085RMP, 2015 WL 12643792, at *11 (E.D.

9  Wash. May, 11, 2015).

10    Mr. Auer told the court during the hearing that Rainier has received all of its

11  necessary permits and third-party permissions to complete Paragraph 7(f). Mr. Auer

12  further represented that Rainier should complete all of the required modifications by mid-

13  January 2018. In light of Rainier's representations, the court makes the following

14  modifications:

15    First, Paragraph 7(f) now reads:

16    Rainier Petroleum will implement measures to prevent any *untreated*
      stormwater from the portion of Pier 15 (also known as the Facility's fueling
17    dock or pier) on which Rainier Petroleum operates (approximately the
      western half of the pier) from discharging to Elliott Bay. Rainier Petroleum
18    will plug existing holes in its pier that presently discharge directly to Elliott
      Bay, install curbs, berms, and/or barriers as required to prevent sheet flow of
19    stormwater from its portion of the pier to Elliott Bay, and otherwise ensure
      adequate stormwater collection and conveyance infrastructure exists to *either*
20    capture the stormwater from the portion of the pier on which Rainier
      Petroleum operates and direct it to the sanitary sewer, *or by first treating the*
21    *stormwater in the Facility's advanced stormwater treatment system,*
      *provided that the treatment system is augmented to handle the increased flow*
22    *volume. Rainier Petroleum can implement a proportion of both techniques*

1      *to the extent it chooses so long as Rainier Petroleum prevents all untreated stormwater from its portion of the pier from discharging to Elliot Bay.*

2      (Consent Decree ¶ 7(f) (modifications emphasized).)

3      Second, the Consent Decree's termination date is extended to one year following

4  the date that Rainier comes into compliance with the modified Paragraph 7(f). *See*

5  *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1120-21 ("The failure of substantial compliance

6  with the terms of a consent decree can qualify as a significant change in circumstances

7  that would justify the decree's temporal extension.").

8      Third, on the first day of each month that Rainier pays a $10,000 coercive monthly

9  sanction because it remains out of compliance with the modified Paragraph 7(f), Rainier

10  must submit a status report to the court along with its $10,000 fee. The status report

11  should inform the court of the progress Rainier has made since the evidentiary hearing to

12  come into compliance with the modified Paragraph 7(f), as well as the steps remaining

13  for full compliance and the expected dates for each step.

14      The court finds that all three of these modifications are warranted and "suitably

15  tailored to resolve the problems created by" Rainier's noncompliance. *See United States*

16  *v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005).

17               **IV.   CONCLUSION**

18      For the foregoing reasons, the court GRANTS in part and DENIES in part

19  Soundkeeper's motion (Dkt. # 101). Specifically, the court GRANTS Soundkeeper's

20  motion with respect to holding Rainier in civil contempt. The court GRANTS

21  Soundkeeper's motion for compensatory and coercive sanctions against Rainier as

22  described above. The court GRANTS Soundkeeper's motion for attorneys' fees and

1  costs pending consideration of Soundkeeper's forthcoming accounting and motion. The

2  court DENIES Soundkeeper's motion with respect to re-opening discovery. Lastly, the

3  court GRANTS the parties' request to modify the Consent Decree as described above.

4       Dated this 19 day of December, 2017.

5

6  JAMES L. ROBART
  United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 33